Thank you. Please be seated. This is Oral Argument in the Lands Council v. American Court of Appeals. Judge Paius, can you hear and see us? Yes, I can. And Judge Bea? Yes. Thank you. Excellent. Thank you. With that, counsel may begin. May it please the court, my name is Ralph Blumers. I represent the plaintiffs in this matter. This matter has been fully briefed, and in addition to taking your questions today, I just want to focus on two points. I hope to leave about five minutes for rebuttal. First, the Forest Service's site-specific amendment is arbitrary and capricious and not supported by the record. And second, the Scott Mortality Guidelines are not science, according to the Forest Service's own definition that is set forward in the FBIS, nor do the guidelines meet the scientific integrity standard under NEPA. The site-specific amendment is arbitrary and capricious and not supported by the record because the record shows that the amendment contradicts years of guidance from the Forest Service that only permitted site-specific amendments for specific reasons of ecological and biological urgency and other kinds of amendments on a site-specific basis that were limited, didn't go across watersheds, and weren't solely for economic reasons. This amendment covers land that goes across multiple watersheds, is solely for economic reasons, and violates the direction in the Eastside EA, in the Eastside Panel Report, and the screens themselves. Counsel, one of the questions that has occurred to me since we've had this case before, and the fire itself was now almost three years ago, are the issues in this case moot? I mean, one of the big issues was whether the salvage logging operation could go forward and whether certain trees actually were dying or not dying. And after this period of time, are there any trees in dispute remaining? That's an excellent question. As Dr. Kevin Ryan of the Forest Service has stated in his research, within two years of fire, you'll see 95% of the mortality that occurs from fire effects. And then pretty much after that, all you see is the survivors. The issue in this case is that there are many live trees that are proposed to be logged using an unverified hypothesis of delayed mortality. So, in terms of whether... Are there trees that are proposed to be cut that are not dead yet? That may be recovering and are quite live. There are live trees that may die in the future, and plaintiffs dispute that, but they are live trees currently. And it's unlikely, according to the science coming out of the Forest Service's own research station, and our field verification that we have done, and our comparison of the Scott Guidelines to the best available science, which is cited in Tables 1 and 2, to the declaration of Edwin Royce, if you compare at... In the excerpts of record at 272, 273, you'll see two tables prepared by Dr. Edwin Royce, where he compares the outcomes using the Scott Guidelines to the actual peer-reviewed scientific literature. If the Forest Service was just proposing the logging of dead trees, then this issue about whether the live trees are going to die in the future would no longer be an issue before the court. But they're still proposing to log live trees, calling them in essence dead green trees. But they're not likely to die, according to the peer-reviewed scientific works that show the likelihood probability of mortality in the future. One point that I want to emphasize is that the protection for live old trees was put in place to meet the diversity mandates of the National Forest Management Act. And this is important because the Forest Service has chosen to amend this standard in a manner that contravenes that direction. It did it for economic reasons, and it did it in a way that doesn't maintain or enhance these resources as much as possible. The Forest Service, when it first put this direction into place, contemplated replacing these interim screens with a broad-scale management plan. Currently, in the Blue Mountains, covering both the Umatilla National Forest, the Wallowa-Whitman, and the Malheur, the Forest Service is undertaking the Blue Mountain Forest Plan revision process. As part of that process, the Forest Service could consider alternatives to the screens and disclose to the public how it's meeting NIFMA's diversity mandate. In this case, it's chosen to short-circuit the appropriate procedures and just do a site-specific amendment in a way that it's never done before. And for those reasons, it is arbitrary. Even if we assume that their scientific method is reliable, the Forest Service is allowing the logging of trees that have a 50-50 chance of living or dying, and then it is taking an axe and chopping into the base of the tree on three quadrants and making an ocular determination as to whether that tree is still alive by looking at the cambium and seeing if it's wet. That method is, one, highly unreliable, and two, provides for pathways for insects or disease, and so contradicts the standard that still remains in the screens to maintain or enhance these resources as much as possible in addition to all the guidance. There's a number of reasons in the excerpts of record that we provided to the court. The letter from Dr. Carr, who's also a co-author of the Eastside Scientific Society panel report, saying that they're betraying science, they're using a policy decision and masking it as scientific, Waring saying it's an inaccurate tool, Dr. Franklin saying the significance of this change for these depleted resources. The watersheds that this is impacting include the upper Tucannon, the Little Tucannon, the Willow Springs, the Cummins Creek, and I could go on. It's not just in one watershed, and it's impacting a resource that takes centuries to produce, so the claim that it is a time-limited amendment is just simply without merit, because the very resource they're taking would take a century or two to return to the landscape. Turning to my second point, the Scott guidelines are not science. The agency only gets deference to the- Now, pardon me, counsel. You say that it's going to take a century or two for a ponderosa pine to grow? For a old-growth ponderosa pine that is protected by the Eastside Screens, Judge Bea, those trees are about 150 to 200 years old when they're 21 inches, so the very trees that are targeted, that are supposedly dying, do take over a century to produce, and therefore the claim that it's just a site-specific amendment and time-limited is false. Turning to the second point, and it's related to the claims in the first point, the Scott guidelines are not science, and the Forest Service has itself stated in its FEIS that science, of course, and I'm quoting, means peer-reviewed and published by credible sources and does not include articles, comments, or input that is simply opinion or editorials by scientists. Are we, counsel, are we supposed to apply the Doebert standard here to determine whether this is admissible evidence, this is scientific evidence, or is there some other standard that you would urge us to apply? Well, I think in this, that's an excellent question as to whether this Court could fashion a rule using FRE 702 or Doebert. I think in this case, simply apply the standard that the Forest Service has set forth in its own FEIS, which does mirror in many regards some of the factors considered under Doebert. The Forest Service says science means peer-reviewed and published by credible sources, and then the Forest Service goes on. The Scott guidelines were apparently not peer-reviewed or published in a credible source, and admits that in its FEIS and its final supplemental EIS. And then the one piece that was published, the defining conifer mortality piece, the Forest Service states that that article does not report research results and is a policy decision. It basically is an opinion piece offering commentary by scientists. I think under the NEPA standard, the guide that this Court should adopt is not a bright line rule, but it's a scientific integrity rule of reliability that traces itself back to a long line of well-reasoned precedent. Lands Council v. Powell, Idaho's Boarding Congress. If the FEIS did not contain a definition of science, would we, in your view, have to apply one? That is, is the agency entitled to rely on a source that is not scientific in the I think the minimum standard is the standard of reliability, and in this particular context, the minimum standard of reliability is heightened by the fact that we're dealing with a resource that's been significantly depleted across the landscape. So in this case, I think we're not even close to that line of some of the other past precedent. This is, in my view, a significant overreach, a clear overreach beyond the standard of reliability. The statute doesn't actually require science or peer review, does it, in those terms? The National Forest Management Act, no, it does not. NEPA requires that they ensure scientific integrity, and Earth Island Institute interprets that as identifying any methodologies used in explicit reference to footnote to the scientific and other sources relied upon for the conclusions. So that would be equivalent to peer review, to showing reliability, showing that there's been validation in the field. So if I may, I would like to reserve the remainder of my time. Certainly, for the benefit of my colleagues, he has about four and a half minutes on his rebuttal time. May it please the Court, I am David Shilton. I am here representing the U.S. Forest Service. I plan to give five minutes of my time to the intervener, represented by Mr. Horngren. First, let me say we appreciate the fact that the Court has expedited this case. I want to first just refer to the question that Judge Graber asked about, you know, are there still trees out there that are subject to this controversy about marking? And there are some. The two sales at issue, called the ricochet and chicken bone sales, include areas where there was damage to trees from the fire, which has led to secondary effects like fungus and insect infestation, under which the trees are dying. So they're not dying from the first order effect of the fire, but from what are called second order effects. And so while they may have had green needles for a while, they're now in the process of dying from those second order effects. So there are trees which are in this sort of middle category that's in dispute here, and which the amendment to the forest plan that was recently enacted goes to and sets out a methodology for making the determination of what's a live tree and what is a dead tree. I'd like to ask you about that definition. As I understand it, the position of the Forest Service is that a live tree should be defined in this specialized way, not just to mean something that isn't all the way dead, but that means something that isn't either dead or dying by a certain explanation. That's correct. Okay. And in view of the fact that what's being amended is a definitional term that will apply to everything, I don't understand how it is possible to do that on a sort of one-time specialized basis only. In other words, if you're defining lakes or you're defining mammals or you're defining live trees, which presumably applies to numerous areas, how is it permissible to do this as a limited amendment? Well, first I think it's important that the Forest Service view this as simply a clarification and expressing the position that it had always assumed was the case, that in its technical view, a dying tree was not a live tree. So it realized it needed... But in our previous opinion, we said that the definition, that there was no definition and if the Forest Service wanted one, it could amend the plan. But rather than do that, it seems that there was just this sort of expediency of, well, we can do it here and then if we have another operation somewhere else, we can do it there just a little bit at a time rather than amending a definition that by logic would apply elsewhere. Well, I think it's more than just an expedient. By doing it on a limited basis just for this project, it means that if another situation comes up, another salvage sale comes up, maybe in a different forest with somewhat different tree base, they can look at the science that is in existence then and if any revisions to this need to be made, can make those revisions. So it means that the Forest Service can evaluate what the science is right now with regard to this area and do a limited amendment. But see, you say it as the science regarding this area, but if it's definitional, I don't understand what's special about this area. I mean, a live tree has a meaning according to the Forest Service just as a mammal would have a meaning throughout some larger arena. I take your point and certainly by saying that live does not include dying trees, that Forest Service view is its overall view and if there were another amendment that came up in another context, the Forest Service would look at it in the same way because this is the way they have always looked at live versus dead trees. They've never included dying trees in the category live. But I don't think there's any requirement that the Forest Service make this amendment universally for the whole northwest region rather than doing it just for this one project and then if the issue comes up again, they can take a new look and see if it's appropriate in that other context. So I think that the Forest Service is... I get it. Counsel? Yes. I get it. That would also be on a one-time basis. I'm sorry, could you... I didn't quite get that. The last comment you made suggested the Forest Service could just adopt a new definition based upon a new situation. Judge Pius, could you lean towards the microphone? It's quite hard to hear you here. Okay. Can you hear me now? Sort of. Let me try it again. I don't know what happened to the sound. I just want to know if what you're saying is that the Forest Service could adopt a new I understand the question is whether the Forest Service could adopt a new definition in a different area with different circumstances and I think that while the Forest Service would apply its same belief about live and dead trees, that it might have different percentages for when it required you to chop into the cambium and those sort of technical issues, we'd have to wait until we got to that situation, I think, to evaluate that. And I think the case that bears on this issue is this Court's decision in Native Ecosystems Council versus DOMBEC, which considered a forest plan amendment which was specific to a particular timber sale. It had to do with elk habitat and road density and because of particular circumstances, that sale was not going to comply with the forest plan standard and so there was an amendment that was done on this site-specific basis and that was upheld and this Court emphasized the wide discretion the Forest Service has to do site-specific amendments to forest plans. I guess I just have difficulty understanding how a definition that you just described as being the Forest Service's overall view is the same as some site-specific circumstance, like whether there are a lot of oak trees or not a lot of oak trees. Right, well, I think that the overall view of what a live tree is, that I guess my point is that there's no requirement that the Forest Service must do a region-wide or even a forest-wide amendment implementing its view of that term. There's no restriction on the Forest Service doing this as a site-specific amendment and I think Native Ecosystems Council supports the view that the Forest Service has the discretion to do it on this site-specific basis and perhaps it will be a precedent for future action, but that doesn't mean that the amendments in the future can't vary from it. I think agencies generally can proceed on a case-by-case basis. They don't have to do general rulemaking. They can decide things by individual orders. So I think this is consistent with the sort of decision-making that courts have found that agencies can do and especially since this was simply the Forest Service clarifying the definition that it always had intended to express but had not expressed clearly enough, obviously, that it's simply not the kind of change that requires a wholesale revision to a forest plan. And I think the amendment was certainly supported by science. The Scott Guidelines are guidelines. They are an agency methodology, which this Court has frequently said that agencies have a great deal of discretion to determine which methodology they're going to follow in areas of their expertise. And so there is no statutory or other requirement that guidelines be peer-reviewed. What the Forest Service was saying in the environmental impact statement was that when they were looking at these various articles that may have been critical, they'd look at whether they were peer-reviewed or not. But for guidelines like the Scott Guidelines, what's important is that they have been looked at, they have been validated in the field. There have been amendments to the Scott Guidelines that have brought about changes that needed to happen. So I think the guidelines are thoroughly supported by science and have been done in the correct manner. So I don't want to take any of my intervener's time unless there are other questions. Do my colleagues have any other questions for Mr. Shilton? No, thank you. Okay. Mr. Horngren? Thank you, Your Honor. Scott Horngren on behalf of the interveners. The Scott Guidelines and the question of science, I think, can be handled by addressing or looking a little bit at where the Scott Guidelines come from. And if the Court refers to supplemental excerpts of record at page 91, it discusses that the guidelines that they are developing are based on the Ryan and Reinhart bark thickness equations. It also discusses that they've used the Forest BEHAVE Plus modeling system to address the thickness of the bark and the intensity of fire, referring to Andrews and Bevins. And so interveners would argue that, in fact, the Scott Guidelines are science-based. We don't dispute that they aren't peer-reviewed. But when you step back a little bit, in some ways, they have had more review than a peer-reviewed publication that's just sent to a bunch of professors in a university, where, in this case, the guidelines have been amended twice. They were adopted initially with the assumption that they would be changed based on knowledge from field review, some of which Planoff had pointed out on the High Roberts sale, some of which Dr. Scott and his colleagues have pointed out. And they've changed those guidelines. And in this particular case, interveners would argue that these changes have been important, and the Court should acknowledge these changes and their efforts to better estimate whether these large 21-inch and greater trees are going to survive. On Supplemental Excerpt of Record, page 595, the Forest Service lays out the marking guidelines that will be used here. And significantly, they are requiring that, in order for a greater than 21-inch tree to be marked for harvest, it must have now four of the four quadrants to have dead, or it must have dead cambium. Whereas prior to Amendment 2, and when we were here in front of you before, only two quadrants were necessary in order to mark the tree. And in addition, the Forest Service now, based on Amendment 2, must test whether the cambium is dead not on the outside of the tree, but at the interstices, it explains, the side that's further away from the fire. So we would urge the Court, given the changes that have been made in Amendment 2 here, and also given what Dr. Royce has found, I mean, when you look at his fourth declaration, he went back to these areas that he was going to harvest on. He looked at those. He concluded, in fact, what interveners in the Forest Service were saying, is that those areas were very intensively burned. And, in fact, that he checked some of the trees that were over 21 inches, and he concluded that they were properly marked. On the two new sales that we're talking about today, the chicken, bone, and ricochet sales, he also went out to those sale areas. They had not been completely marked yet, but he did find that there was one 21-inch tree marked. And he went up to that tree to see whether, in fact, it had complied with the new Amendment 2 to the Guidelines, and he concluded that, in fact, it did, and that, in his opinion, even though it had 50 percent canopy closure or 50 percent crown, that half the crown was dead. The cambium was dead on all the sides. And in his declaration, he concluded that, in fact, it met the scientific definition for a dead tree. Let me ask you one clarifying question. As I recall from one of the previous iterations of this case, the trees that are marked are the ones that are not to be cut rather than the ones that are to be cut. Was that an incorrect understanding? It varies by sale and unit, and typically what they will do, they use orange paint for trees that will not be cut and blue for trees that will be cut. And if there happens to be a unit where there are a lot of live trees that they aren't going to cut, they probably would use blue paint. If there's a unit where most of the trees are dead and there's a few trees they're going to, or most, anyway. So it varies from place to place. It does, and it varies even in a sale. It varies by unit to unit, and the sale area map designates whether it's a leaf tree mark or an individual tree mark. So finally, I think on the issue of the overall amendment to the forest plan, we agree with the government that that can be done on a site-specific basis based on the decision in the Domback case up in Montana, and would emphasize that the National Forest Management Act provides that the Forest Service may amend forest plans in any manner whatsoever. That's the statutory language. And really what we have here is when you look at what part of the National Forest Management Act supposedly the Forest Service has violated, it's that they have not been consistent with this forest plan, the Umatilla Forest Plan, 16 U.S.C. 1604I. We would urge the Court that this amendment is consistent. You told the Forest Service that the way it was written did not allow them to cut any trees with green needles. They went back. They didn't do this in a vacuum and understood that you didn't want them, but you authorized them to do it. If they wanted to harvest dying trees, they made that amendment. We would urge you to allow them to proceed. Thank you. Thank you, counsel. We have some rebuttal time remaining. Great. Let me address some of the issues that came up in the argument there. On the issue, I think what we have here is an unverified hypothesis, and an unverified hypothesis is this hypothesis of delayed mortality. Yes, the guidelines have been amended once and then twice as a result of the High Roberts litigation. The only amendment, though, there was with respect to ponderosa pine and did not affect western larch or grand fir or douglas fir. And grand fir is more susceptible to fire, but douglas fir and western larch are thick bark species and have just as much of a chance of surviving and recovering from this fire as the ponderosas do. I was out on the field survey with Dr. Royce and also with Sean Malone, and we found many live trees that were marked for harvest after this court issued its mandate in the preliminary injunction that we had to ask the Forest Service to remark. It's a massive project across multiple watersheds. We visited only a limited scientific subset, according to Dr. Royce's survey protocols, of those. Some units were burned heavily. Some were very green, in fact, completely green, and we submitted pictures of those. So the fact that Dr. Royce reported some results from some units reflects the units that he visited and shows a probability across the landscape. However, there's many live large trees that are predicted to be dying that would live, if not otherwise, long. I think the court is ready. Could you speak more? Judge Pius. No, I thought he was going to speak. You need to speak into the microphone. Yes. So and the other question that you asked is how can this definition be limited? Well, it's not. They proposed it on the thorn project in the Malheur National Forest, and they proposed it on the tripod project in the Okanagan National Forest. What's your response to Mr. Horngren's statutory argument that this is a permissible form of amendment because the plan can be amended at any time and in any manner? So the response to that is that the record does not support this amendment and it's arbitrary and capricious because it contradicts the guidance in the Eastside screens and the science panel report in the Eastside EA that said that these screens would remain in place and preserve options and protect this resource as much as possible until a broad-scale management plan would come into place. The screens are in place to ensure NFMA obligations to ensure a diversity of plant and animal communities. Nowhere has the Forest Service in the record shown how this amendment serves that goal, how this amendment preserves those wildlife resources or meets NFMA's mandate. But the statute, pardon me, counsel, statute doesn't say that the NFMA can. I mean, that the Forest Service can amend only in consistent with the Eastside screen. It says in any manner, doesn't it? Yes, it does. But the context here, Your Honor, is that the context here is that there is significant depletion of the resources and the Forest Service adopted a standard to comply with the NFMA's mandates to ensure diversity of plant and animal communities and specifically said that when that interim screens would go away, it would be replaced by a broad-scale management plan, not by one-time site-specific amendments solely for economic reasons. The record at numerous locations specifically does not support this kind of site-specific amendment. Site-specific amendments are allowed, Judge Paez, when it is to preserve these resources. And I would direct you to the guidance memos in the excerpts of record that Plaintiffs included, specifically the one from Linda Goodman from 2003 that said sometimes you could take a larger tree below another tree to protect it from fire risk, or if you have an excess of this large tree resource, then maybe you can take some. But none of that is in the record here to support this site-specific amendment. It is being done in a way that has never been done before. So the ---- But the ---- I'm looking at 36 CFR section 219.8E, and it says in paragraph, subparagraph 3, the amendment may be limited to apply only to the project or activity. Doesn't that give the Forest Service pretty broad latitude? Yes. That, in the context, though, of the guidance that the Forest Service has had for the past 10 years, specific to this eastside screens requirement they themselves adopted, the guidance said that it needed to have a clear and compelling case of biological or ecological urgency in the short term to do this kind of amendment. And the Forest Service has not indicated that this is an amendment being done to protect this resource. In fact, it's an amendment ---- Well, we heard from your opponent that the death of these trees is not only being caused by the past fire, but now by the results of leaving the trees uncut by an increase in fungus and other insect-type diseases. Isn't that a biological or ecological emergency? In terms of this case, I think one way to think about it, Judge Pai, is it's shoot first. That's Judge Beyer who's asking the question. It's hard to tell when they're far away. Judge Beyer, it's shoot first, ask questions later. I mean, this is an unverified hypothesis that these trees may die in the future, and it's taking them before we even know. I think it's fine for the Forest Service to go out and field test and determine whether its predictions are accurate and reliable, but it's not okay for them to go and implement this in the field in a way that we'll never know whether they're right or wrong, and they've not shown that they are reliable. One additional point I would make is that Dr. Royce compares the peer-reviewed scientific literature in tables one and two to the outcomes of the Scott Guidelines. All those studies that he compares went out five, six, seven years and considered second-order fire effects like bug kill, insects, disease, other things that might mean that a tree doesn't survive. So all those things were part of the peer-reviewed scientific literature, and the Scott Guidelines still grossly deviate from those works. Thank you, Counsel. You've exceeded your time, and we appreciate the arguments of all parties. The case just started in Seattle, and we will adjourn. For the sake of our Portland audience, I'll come back in civilian garb to...
judges: Graber, Paez, Bea